Acting Secretary of Homeland Security Ms. Renewal for the Appellant  Good morning. Good morning, Your Honors. It is still morning. May it please the Court, my name is Ellen Renewal and I'm here for the Appellant, Janet Allen. We're here today largely because after Ms. Allen signed a settlement agreement to enhance her evaluations and provide her further promotional opportunities, the first act that Ms. Hill took in response to that EEO activity was to issue these three performance evaluations without any narrative, although it's required by the rules, and to attach a document that had her lawyer's heading on it, which clearly indicated to any manager for which she might apply for a promotion that these outstanding evaluations were the product of an EEO case. And that happened just two and a half weeks after Ms. Hill learned that Ms. Allen had engaged in protected activity. And because that is the first act of antagonism, that can be considered in raising an inference of retaliatory motive. And what's your best evidence that that was not just sloppiness other than the time? I understand the chronology is significant in your view. Is there anything else that shows this is retaliatory conduct? Well, whether it's sloppiness or retaliatory is a question for the jury. When somebody has a memory lapse or does something silly, that's a defense argument for the jury. Well, my question is, is there evidence that gets you past summary judgment? Because that's the posture in which we get the case. So I'm asking for a judge analyzing the evidence and saying, is there any evidence from which a reasonable trier of fact could have found this to be retaliatory conduct other than the time frame? Well, Ms. Allen did point out to Ms. Hill, which Ms. Hill misrepresents in testimony and jury could find that she's lying. Ms. Allen tells her, you can't attach it that way. You can't attach my attorney's heading right there like that. And Ms. Hill doesn't respond to that. She also tells her that you need to write narratives, and she doesn't do that. So it's pointed out to her that this is irregular, even putting aside the fact that she's an experienced manager and she should know that she needs to put something in the evaluations to support the rating. The fact that it's pointed out to her by Ms. Allen and then she does nothing about it shows her nefarious motive, if you will. There's also all the acts that Ms. Hill takes against her following that. Just a few weeks later, Ms. Allen points out to her that she doesn't have enough staff now to do the IPIA testing, and Ms. Hill completely ignores her. Now, ignoring someone was the act in Hamilton v. Geithner that this court took into consideration as the first act of antagonism in establishing a pattern. And then she continues to exclude her from meetings. And these aren't unimportant meetings. These aren't lunch meetings. These are meetings that are central to Ms. Allen's duties, and that's why it's an adverse action. If working in a dirtier field and using a dirtier forklift is an adverse action for a blue-collar worker, then certainly for a manager, for a government manager to have interference with a contractor that she's responsible as the COTAR for, that has to be more arduous and sufficient to deter a reasonable employee from complaining of discrimination. The pretextual nature of the reasons that Ms. Hill... What about the alternative argument on the exclusion from the meetings that there was evidence in the record about the reasons why she was excluded from those meetings, and there's nothing to undermine that credibility of those reasons? Or to suggest that they're pretext? Okay. What suggests they're pretext? Well, first, with the PricewaterhouseCoopers meetings, she says on appeal and at summary judgment, the argument was made with Ms. Hill's supporting declaration that she didn't meet with PricewaterhouseCoopers that many times, and when she did meet with them, it was for business development, and maybe there was a little talk on occasion about the project. But the pretext evidence for that is in her answers to the EEO investigators' questions, where she admits that she met with Ms. Neal of PricewaterhouseCoopers several times and discussed activities they were handling for us. And she also says in her investigative answers, she says that she, Ms. Hill, was the alternate COTAR, which is absolutely ludicrous, because throughout this litigation, the defense has been that she didn't interfere with the contract, that Ms. Hill was just meeting with the contractor over business development. And that's what she stated in her summary judgment declaration. In fact, in her summary judgment declaration, she says she only discussed current work on occasion, which was appropriate as the director of OAC. Now, if she had been the alternate COTAR, she would have said, of course I can meet with them about ongoing activity. I was the alternate COTAR. The reason she doesn't say that is because it's not true. As Ms. Allen's testimony says over and over again, Ms. Crane was the alternate COTAR, and Ms. Allen was the COTAR. Therefore, when Ms. Hill meets with the contractors, she's violating federal acquisition rules. She's giving them direction on projects, totally undermining Ms. Allen's ability to do her job as COTAR and to do her job with the IPIA testing. And that is why, for a manager to have that going on, to have other people, her supervisor undermining her authority like that, to have her excluding her from meetings with other components of Homeland Security. She excludes her from meetings and doesn't tell her about things. And then she has to do rework. She has to rework things because the directions have changed pursuant to what other DHS components have told Ms. Hill, but Ms. Hill doesn't relay that to Ms. Allen, so then she has to do rework. That's more arduous. The other pretext evidence is that regarding the senior advisement team, in summary judgment, Ms. Hill says for the first time that Allen didn't have a role in that process. She didn't say that in the investigation. She didn't say that in the deposition. This is an entirely different story. Same thing with the January 9th meeting that was about internal controls. Mind you, Janet Allen's title is Director of Internal Controls. So is it inconsistencies that you're relying on? Yes, inconsistencies and shifting reasons. And this court has held that shifting reasons is evidence of pretext. There's also unworthy of credence issues. On her evaluation, she marks her down for not coordinating with the Burlington Finance Center when, in actuality, in Ms. Allen's self-appraisal, she specifies how she did coordinate with the Finance Center, and that's on page 194 of the appendix. And that's her self-appraisal, which the jury can credit. And not only can they credit the fact that she did communicate with the BFC, but that Ms. Hill knew about it because it was in her self-appraisal. So Ms. Hill knows about it, but she still says that she didn't coordinate with them. Now, you could argue that a jury could think the other way, but obviously that's for a jury to decide. And then there's also the issue of Ms. Crane being praised by Ms. Hill for her work when her only responsibility is the IPIA testing. The district court really analyzed this case a little bit differently from how you're arguing it in the sense that the opinion really just focuses on exclusion from meetings and the performance appraisal. And you are reaching far beyond that. And I wonder, given the district judge's earlier ruling, why you think it's permissible for you to wrap in this additional evidence. Well, in Burlington Northern, the Supreme Court said you do have to consider all the circumstances. And when you're talking about motive and pretext, you do, I mean, this court said in ACCA that you have to look at all of the evidence of the circumstances, all evidence that can raise an inference of a retaliatory motive. And so that's why there's the whole pattern of antagonism that starts. And even though we're not alleging certain things as adverse actions, the two adverse actions are, as you said, the exclusion from meetings and the review. But if you want to understand the motive of Kathy Hill, you have to look at all the actions that she took against Ms. Allen while she was working for her. I mean, it's extraordinary the number of times that she tried to undermine her own subordinates' work. And you have to wonder what a jury can make of that. So when the jury is considering motive evidence, they look at all the background circumstances. How do you think we're supposed to evaluate exclusion from meetings as being an adverse action? Well, as I said, you know, in Burlington Northern, where the woman is a forklift operator and she gets a more dirtier job, they say making your job more arduous could deter someone from wanting to engage in EEO activity. Well, for a manager who sits in an office, making her job more arduous is just what Ms. Hill did. It's undermining her authority, interfering with her management of a contract. It's very important. I think the question was focused specifically on exclusion from meetings. So there are these two candidates for adverse employment action. And so we're shifting a little bit from the evidence of motive, retaliatory motive, and disproving pretext, shifting to the element of what is adverse employment action. And it seems like the performance evaluations is pretty clear that that's adverse employment action. And the separate question is, is it a separate element of, is it a separate instance of adverse employment action that she was excluded from meetings? Or is it just sort of more friction in the interaction between them? No. It's an adverse employment action because even putting aside the evaluation, it made her job harder to be excluded from meetings. I think not everything that makes an employee's job harder is an adverse employment action. What's your best case for... I don't think that's true. I think that the Supreme Court said that if you make someone's job more arduous, depending on the circumstances, which would mean how much more arduous, that could deter someone. It's not whether it's an adverse employment action. It's whether it's reasonably likely to deter an employee from complaining about discrimination. And your best case that you would want us to rely on is the Porklip case? Is that where you are? I think so, because it's the Supreme Court. But also, yes. And is that not a hostile work environment case? Or is that a retaliation? No. No, that's a retaliation case where they created the rule that it doesn't have to be employment-related to be an adverse action in the retaliation context. But I think you really have to look at how much harder it would make your job as a manager if somebody was excluding you from meetings on issues that you're responsible for. She gets rated on the IPIA testing. She gets rated on her communications with PricewaterhouseCoopers. So let me just put this in context. There's a settlement agreement in February. Mrs. Hill, or Ms. Hill, becomes her supervisor in March. Is that right? Yes. All right. And then Ms. Hill leaves when? I'm not sure when she leaves. Well, what I'm trying to get at is the government's making the point that the meetings from which she was excluded were for the 2009 performance appraisal period. And you're not complaining. Well, that's not true. That is not true. No, they're not all. A lot of them occur before October 2008. The rating period went through to October 2006. It starts October 1? Yes. Like the fiscal year? Yes. All right. So the meetings before October 1, the exclusion, you're saying, was relevant to the 2008 appraisal period? Yes. What are the meetings before October 2008? And can you just help us out with the record? We don't have specific meetings, but the allegation is that she was meeting with PricewaterhouseCoopers consistently. She also directs her to cease communications with DHS, with Department of Homeland Security staff, including on PricewaterhouseCoopers' matter. So it's really the PricewaterhouseCoopers' issues. So the district court takes the position that, as I understand it, that there's no evidence that she ever, your client, ever asked to attend these meetings, that she had Mrs. Hill's calendar, and that then Mrs. Hill, after these meetings, would send e-mails to your client. Yes. There is evidence of eight specific, six, seven, I mean, I did list out the evidence of several meetings where, in her declaration, she says she didn't know about it until after the fact. And can we, I thought Judge Pillard was asking you to help us with the record, to pin down the pre-October 1 meetings. In other words, if all the problems happened after October 1, as far as exclusion from meetings, and didn't go into the appraisal for 2008. Well, they're separate adverse actions. So she excludes her from meetings from April 2008 all the way until January, February 2009. That's one adverse action. And the other adverse action is the poor evaluation. The two interact because, while she's excluding her from meetings, she's holding her responsible for communication in the evaluation later. So there's some cause and effect there, but really the adverse actions are separate. So when Mrs. Hill, in her 2008 appraisal, refers to your client's failure to communicate, your client's complaint she's had, that's all within this 2008 appraisal period? Yes. To my knowledge. But there is another pretext with regard to the evaluation, but my time is up. No, I know. And when Judge Kavanaugh was questioning you, I think you discussed some of those. I just want to get the sequence here, because when I tried to do a time chart on this, it's that the problems you're alleging are while Mrs. Hill was present. Yes. But that at least for the period October 1 through the end of the year, the appraisal that she received, she's not complaining about. No. So my question was, did Mrs. Hill, in appraising her for 2008, rely on events that had happened after October 1? In other words, if Mrs. Hill is concerned about your client isn't attending meetings, that she's getting complaints about failure to communicate, were those things that happened after October 1? That's why I thought the timing here was significant in the sense of what your complaint is about. I understand you saying separate adverse actions, but I'm trying to understand, because you're not complaining about the 2009 performance appraisal. No, for 2009. Yeah, which starts October 1. Right, of 2008, we're complaining about exclusion from meetings only. We're not complaining about the evaluation. I believe Mrs. Hill left before that evaluation was done, but also it's interesting that after Mrs. Hill leaves, Mrs. Allen is included in all these types of meetings. Did you respond to the question about why Mrs. Allen didn't point out to Mrs. Hill, hey, what's the story, these are my clients, I need to be on these meetings? She did. She did. There's actually an email in the record where she says to her, it's inappropriate for you to meet with the PricewaterhouseCoopers folks without me or Ms. Crane. And she says, well, you were out, so I would have invited you otherwise. But the evidence is there are meetings that she didn't know about until after they happened. Emails she gets where Ms. Hill relays a conversation or just finding out about it afterwards. Just because she had access, she had physical access to go and look at her calendar, but that doesn't mean that every time there's a meeting she's actually looking at the calendar because she didn't know that she needed to check her calendar or say she makes an appointment and then has the meeting. I think it's incorrect to hold Ms. Allen responsible for looking at Ms. Hill's calendar. Also, the fact is that at her deposition, Ms. Hill testified that it was her decision whether to invite Ms. Allen to meetings. And if she didn't invite her, it was because she didn't belong there. So I think it would have been futile for Ms. Allen to ask to be invited to meetings. All right. We'll give you a couple of minutes in rebuttal. Thank you. Hear from the government? May it please the Court. The chronology is actually essential to this case. The two adverse or the two discrete acts at issue here are the November 2008 performance rating and then the subsequent handful of exclusion from meetings that were in the 2009 review period, the very review period where the plaintiff received a higher rating. In fact, it's undisputed that Ms. Hill was the rating official. That's at the Joint Appendix 556, paragraph 51. When did Mrs. Hill leave? What the record reflects is that she gave Ms. Allen a midyear review. No, when was Hill no longer the plaintiff's supervisor? I believe it was towards the end of 2010. So Ms. Hill gave Ms. Allen an exceeded expectations rating for fiscal year 2009, gave her a very favorable midyear for the subsequent review period, but was not the ultimate, had left before her 2010 review. So is your understanding of the record that Mrs. Hill may have had a different management style than the plaintiff had been accustomed to, but that the problem really arose from Mrs. Hill's perspective that there was a deadline to be met and it was not met and it had to be extended, and that she viewed plaintiff as the GF15 manager, as in a position where that was her responsibility to figure out how to get the job done. And this is the plaintiff response, I advised Mrs. Hill that I needed more staff, that the job at which Mrs. Hill acknowledged was intensive, and that Mrs. Allen alerted her to the fact that she needed more staff. Mrs. Hill never responded, and according to the plaintiff, never made herself available to discuss the need. Then Mrs. Hill comes and says, well, you know, it's within my discretion as to how we allocate resources. But the question is, there's sort of a disconnect there that, just assume for the moment that Mrs. Hill does have the authority to allocate resources, but then can you criticize an employee who says she doesn't have the manpower to do the job, and you admit it's an arduous job, and you criticize her for not meeting a deadline that the employee has said you can't meet with the staff. Well, Your Honor, that's not connected to the primary reasons for the November 2008 meeting. The primary reasons were the complaint by the Burlington Finance Center about Mrs. Hill, that she was not effectively communicating with them. Now, that's not disputed that the Burlington Finance Center made that complaint. The other primary reason was the failure of Ms. Allen to monitor the Finance Center when they were doing the testing work and ensuring that they had the documentation they needed. And all this was connected to the deadline, wasn't it? Well, there are various deadlines in the performance plan. No, no. Counsel, you know what I'm referring to. It's the deadline that had to be extended, and you're more familiar with the record than I am. That's why I'm asking these questions. All right? So the plaintiff says, I don't have the staff to do the job, and basically Mrs. Hill says, you know, I can't give you any more staff. There isn't any indication that—I'm just trying to understand that plaintiff, what, refused to do the job or delegated inappropriately since Mrs. Crane was praised by Mrs. Hill? I'm just trying to understand what's happening here. Well, I think that—the issue of Ms. Allen stating to Ms. Hill, I don't think I—you've expanded the scope of this particular project. I don't think I can make—it'll be difficult to make the deadline, pertains to a secondary reason under one of the performance elements. Right, and it's the one I'm asking you about. Okay. Well, that's the performance element two, where she received an exceeded expectations as opposed to achieved excellence. And there were two reasons under that performance goal. The first reason was the complaint by the Burlington Finance Center, which is unrelated to any issue regarding staffing. The second issue related to this test of effectiveness where— Well, maybe it is and maybe it isn't. That's what I'm trying to understand about this case. If I have a job and I say I don't have the staff to do it, and that's affecting me in various ways, and one of them is I'm not communicating as much as I should be. That's all I'm trying to understand about this case. Well, I think her staff—there's no evidence that Ms. Hill had the authority to increase staffing. I'm assuming that's all correct. Well, I think Ms. Allen's position is that— And you say the failure to communicate has nothing to do with that. And I just want to be clear, how do we know that? Well, because when—what we know is that when Ms. Allen received her November 2008 rating, she sent an email to Ms. Hill responding to the various issues that Ms. Hill had identified. And that's in the record at Joint Appendix 518 and 519 are the main pages. And she doesn't—with respect to the Burlington Finance Center complaint, she doesn't say, I didn't have the staff to communicate. She says, I outsourced that to Price Waterhouse or to the contractor. Well, under her performance goal, she's responsible for the communication. So whether she outsourced it or not is not the issue. As to the second issue, the not meeting the deadline under this test of effectiveness, her response is, well, I told you earlier that when you increase the scope of this project, it would be difficult to meet the deadline. You see, I was right. So under Ms. Allen's contemporaneous characterization, the Burlington Finance Center complaint was unrelated to the staffing issue, and the staffing issue was only part of that. And we submit that the Burlington Finance Center complaint in and of itself was grounds for Ms. Hill not to give Ms. Allen the highest rating but to still give her an exceeded expectations under that element. It's in Performance Element 3, which is where the documentation issue arises. And again, in that email, Ms. Allen responds. She doesn't say anything about you interfered with me trying to do this. What she says is, I delegated that to my subordinate, Ms. Crane, even though she admits that she was ultimately responsible in the performance goal required her to make sure the finance centers were getting that testing done. Now, there was, I think, short- And Ms. Crane did a great job, according to Ms. Hill. According to Ms. Allen, who was the rater for Ms. Crane, Ms. Crane was a GS-12 or 13, Ms. Allen gave Ms. Crane an achieved excellence. From Ms. Hill's standpoint, as the second-level reviewer, she deferred to Ms. Allen. Ms. Hill's concern was that Ms. Allen didn't meet her deadline. And the fact that Ms. Allen mismanaged the process is not inconsistent with the notion that Crane might have done what Ms. Allen was asking her to do. So there is no inconsistency there. And so you're saying the documentation and the failure to get this documentation in a timely manner is totally divorced from the staffing concern that Ms. Allen had expressed? There's nothing in the record to suggest it related to staffing because the finance centers had been assigned the task of doing that testing and collecting the documentation. It was Ms. Allen's responsibility to monitor that process. And so she told Ms. Hill that of the, what, 300 or 500 documents, 10 had been identified. Correct. So that's monitoring. Well, but her... I mean, what could she do? She didn't have authority over the finance centers. Well, she could have been proactive. Instead of just delegating it to a lower-level support unit, she could have been proactive and gotten involved. Proactive? What does that mean, counsel? Well, because once... She put her best person on there. In July 2008, when this came to a head and the deadline was fast approaching, Ms. Hill said to Ms. Allen, okay, there's a shortage of documentation. What do you propose to do? And her response was not to offer a plan to remedy it. It was to say, again, I told you it was a bad idea to let the finance centers do this, and I don't foresee any way to remedy it. So in other words, she was prepared to let the agency have a failing rating on this portion of the audit that would ultimately occur. And so what did Ms. Hill do? She then had to take the reins, and she... She extended the deadline. Well, they extended the deadline for a month, and she went and got... But the evidence, Your Honor, is that she's extended the deadlines, and she didn't... Her testimony is she didn't take off in the review because Ms. Allen failed to meet the deadlines. She credited her for the extended deadlines. Her testimony is she didn't collaborate effectively with the finance centers, which was in her performance plan as part of the parcel to the requirement. I mean, I just want to understand what she was supposed to do when the only thing her supervisor figured out to do was to extend the deadline. Well, extend the deadline and be more proactive instead of just relying... What does that mean, proactive? It means personally getting involved. What, going over and going through the files and standing over the... Getting on the phone. ...finance center employees and saying, work harder? Getting on the phone, making sure they're meeting, they're collecting the evidence, trying to... Did Mrs. Hill ask for weekly reports? I'm just trying to understand the disconnect here. Ultimately, Your Honor, the question, the legal question for summary judgment is did she honestly and reasonably believe that Hill was not being responsive and not monitoring this? And the evidence is very clear if you look at the e-mail communication. No, I thought the question was here were there material disputed facts. Am I just wrong about that? Well, is there a genuine dispute as to whether Hill honestly and reasonably believed in the reasons she gave? And the contemporaneous e-mails establish that exactly what Hill has explained happened. Allen didn't have a plan to remedy the situation, was prepared to let the agency obtain a failing result. And the whole purpose of this office was to cure deficiencies if it's not possible, not allow the agency to fail in the ultimate audit. And so the contemporaneous record, the e-mail exchanges show Hill said, what's your proposal? And she didn't provide a proposal. She said, I told you this would, you know, I told you so. Mr. Simon, I'm interested in your perspective on the material adverse action element, and in particular in the context of a retaliation claim. I mean, if it's in the context of a standalone discrimination claim, there are pace lights you have to suffer. It seems like potentially that analysis is different in the context of retaliation, and it appears that Ms. Allen is arguing that this is a kind of death by a thousand cuts. And so things that would not be materially adverse individually accumulate to become materially adverse. It's just a headwind against her in getting her job done. What's your legal position as distinct from kind of record narrative on that issue? Well, each of the discrete acts that she's identified, the claims of retaliation are limited. And because this is a discrete act case, she needs to establish that each of the discrete acts are materially adverse in and of themselves. What do you mean it's a discrete act case and she's identified discrete acts? She seemed to be, her counsel was up there giving a whole litany of different events. But the actual claims before the court, the actual claims on appeal, and I understand you'd be asking about the exclusion from meetings. If you look at Ms. Allen's EEO declaration, which is in the joint appendix at 234 to 242, and also page 244, that is the list of the exclusion from meeting claims that she raised in the administrative process. They date from November 2008, not prior to November. They date from November 2008, which is after the performance rating, to February 2009. And there's a handful of meetings at issue. But that's under Burlington Northern. That's potentially a problem to exclude someone from meetings, a problem meaning it can rise to the level of something more than what the Supreme Court called petty slights or minor annoyances because meetings can be very important to your performance of the job. Everyone in Washington fights to get into the meeting. That's the whole deal. And so I think meetings are critical to someone's job performance at times. And so here the Burlington Northern language is admittedly leaves a lot of fuzziness, but I'm hard-pressed to say that I agree that exclusion from meetings is not an adverse action. You, of course, have an alternative argument on that, and I was exploring that. But on the adverse action side, because they do use the example in the Supreme Court about weekly training launches, that would qualify. And what they use to distinguish are petty slights or minor annoyances, simple lack of good manners. On the other hand, schedule changes could matter to some employees. Weekly meetings could matter to some employees. And also the Court makes clear it doesn't have to be related to the terms or conditions of employment, which I think is important because that's something that is in the district court's opinion that I'm not sure I agree with completely there. I think it's more accurate to say she was not affirmatively invited to certain meetings. This is in the context of a supervisor. So that's your, just to be clear, that's an alternative. That's accepting that it's a potential, assuming, arguing, oh, it's an adverse action, but you have a good reason why she was not invited to the meetings or did not avail herself of the meetings, and we should affirm on that alternative basis. Is that what you're saying? Well, I'm not conceding that these are. I understand. I'm not going to hold it against you. Assuming if the Court does not have to make the determination that these are non-invitation, these meetings was not materially adverse in order to affirm, because the record is undisputed as to the reasons why Ms. Hill was not included in these meetings. I'm going to stop you. I'm sorry because I'm really focused on this point. So you have one argument, I think, or the district court makes some point about she knew about the meetings and didn't avail because she had the calendar and didn't avail herself of going to the meetings or trying to ask to be included in the meetings. Is that part of the argument? That is very significant because much of the plaintiff of the appellant's brief is on the PricewaterhouseCoopers meetings. Yeah. If you look at her deposition testimony on the Joint Appendix 411 to 413, that's where she discusses those meetings. She says these were scheduled meetings. It's undisputed that Ms. Allen, who was also undisputed in meetings constantly, made her calendar available to her subordinates. They were free to ask her to participate in any meeting, and Ms. Allen could not identify a single meeting where she asked to participate and she was not permitted. In the context of the PricewaterhouseCoopers meetings, Ms. Allen has attested that those were business development meetings. So the response plaintiffs' counsel gave in the briefing here today is that there were shifting explanations about the reasons for the exclusion from those meetings. So can you respond to that? Right. So, first of all, the document that the plaintiff is pointing to, this May 2009 EEO declaration, is not part of the record. It was attached to the reply brief. Now, certainly, appellant had the opportunity to make that part of the record in district court. If they believed it showed an inconsistency, they did not do that. That said, it still doesn't show an inconsistency, because what Ms. Allen says in that EEO declaration is that she met with Pricewaterhouse to discuss their current activities and business development. And what she's explaining is that when you talk about business development, sort of part and parcel of that is, okay, what are you currently doing for us and what else can you be doing? There's no evidence, other than hearsay, that Ms. Still ever gave technical direction to Pricewaterhouse at any of the meetings at issue. That's where I point the court to the joint appendix at 411 to 413. Ms. Allen's evidence, which is very vague and unspecific, is that she was told on occasion, can't remember when, can't remember the details, by Pricewaterhouse that at some meetings, not sure if it's the meetings at issue, Ms. Hill gave technical direction. So she's proffering what she was told by Pricewaterhouse about what Pricewaterhouse allegedly was told by Ms. Hill for the truth of the matter asserted. And that is hearsay. She did not, during discovery or in summary judgment, deduce any testimony from any of these Pricewaterhouse folks about whether, in fact, Hill gave technical direction to them. So there's no evidence, confident evidence, that Hill even did at these meetings what Allen alleges she did. Therefore, the record is undisputed that the purpose of the meetings was business development. And Allen acknowledges, again, on pages 411 to 414, I think, of the joint appendix, that it is perfectly appropriate for Hill, as the office director, to have business development meetings with contractors. I do want to make sure the record is clear as to one or two other points. Ms. Hill, Allen, the January 2009 meeting that was referenced by counsel, the list of attendees for that meeting is at the joint appendix at 537. Those are all Deloitte contractors. The record is undisputed that Deloitte worked on something called A123 remediation. The COTAR for the Deloitte piece of this was Ms. Hill. At pages 365 to 367 of the joint appendix, again, Ms. Allen's deposition, she acknowledges that she had no involvement at that time in A123 remediation and had no reason to be talking with Deloitte. She was involved in something else called A123 testing, which was the testing that was done to see if there were deficiencies, which would then be remediated on the second piece of this process. So for that set of meetings, Ms. Hill's reason is it wasn't part of her job. For the senior assessment team meeting, the one meeting on December 2008, the record is that that was convened not by Ms. Hill but by Ms. Hill's boss, the CFO. And Allen lists on her resume, which is the joint appendix 178 to 179, her role in the senior assessment team reconstitution as one of her greatest achievements at ICE, that she played an integral role in that. So for that set of meetings, I would submit it could not possibly have harmed her in any way. In fact, she was able to, after the initial sort of meeting that Ms. Hill had with her superiors and Deloitte was able to then be actively involved in that process, and no one prevented her from doing so. The other point I want to make, counsel has said that there are countless instances where Ms. Hill demonstrated antagonism. Well, the record actually reflects that Ms. Allen identifies just a handful. This issue about her being cut off from communications with DHS, there was a May 2008 email at the joint appendix 526, where Ms. Hill's superior says in order to maintain a consistent message to DHS, communications should be routed through the office director. Ms. Hill passes that email on to Ms. Allen. Ms. Allen says, sure, I always do that anyways. And by the way, when you do meet with DHS, she's not asking to be part of those meetings. She says, keep me in the loop. That's exactly what Ms. Hill does. If you look at the joint appendix at 539 and 542, she meets with Mr. Mason and Mr. Wetglow, DHS folks, and then emails Allen about what happened, just as Allen had requested in May 2008. The September 2008 meeting or interaction that is allegedly part of this pattern of antagonism, that's at the joint appendix at 528. And there, Ms. Hill isn't saying, don't ever speak to DHS. She's saying, you brought up this particular set of findings to DHS without running them through me. Please don't talk with them about those findings until we have a chance to talk, which is absolutely consistent with what the superiors of both Hill and Allen had asked of their subordinates in this May 2008 email. So counsel has stated there was antagonistic acts, but there's nothing in the record to support it. The February 2008 settlement, Ms. Hill is a new supervisor. She never rated or had limited interaction with Ms. Allen, and she's not in a position to provide a narrative about what Ms. Allen did or did not do during the prior three years, which is what the settlement agreement was addressing. She followed the letter of the settlement agreement. When an employee says you're supposed to fill in some reasons and the supervisor says, I don't really know, you can always say, let's have a conversation about that. Who would be good people that I should talk to to find out that information? I mean, this happens a lot in employment settings, and Ms. Allen says she raised that. Ms. Hill said, hey, look, you're leaving this empty, and Ms. Hill didn't fix it. Right, but this is in the context of the implementation of the settlement agreement. Right. Regarding claims that had nothing to do with Ms. Hill. Right, but it also involves Ms. Hill fulfilling her supervisor responsibilities in a way that doesn't harm Ms. Allen. I mean, anybody knows that if you include a lawyer letterhead, it's going to blacklist the person as a troublemaker, and it's devastating. The appellant concedes that, in the reply brief at page 7, that Ms. Hill acted in compliance with the settlement agreement. In fact, Ms. Allen had run that up through a separate administrative process about whether it was in compliance, and DHS found it to be in compliance, and that was never appealed. So could Ms. Hill have done more? Perhaps, but what she did and what she was tasked to do was to implement the settlement agreement. And the fact that there was a fax trailer on top of the list of accomplishments that Ms. Allen submitted, that's the fault of her counsel for choosing to fax over the list of accomplishments instead of having them delivered in some other fashion. And there's nothing that would have stopped Ms. Allen from whiting out the fax trailer if she wanted to submit these performance reviews for any job applications. So the theory sort of fails from the start that Ms. Hill somehow started off with this antagonistic approach to her. She was a new supervisor trying to do the job that she was tasked with. And I will just, if I could, wrap up. A lot of talk about the ultimate question, was there a retaliatory motive here? So not only do all these events that are actually challenged happen months after the settlement agreement issue, but what you have is evidence of a supervisor who's very busy, constantly in meetings, making available to her subordinates her calendar so they can ask to participate. And there's no evidence that Allen asked, asked any of the specific meetings and was denied that request. And so where is the effort to retaliate here? You have someone who's busy trying to keep their subordinates in the loop to the best they can under the circumstances of the job that they fixed. All right. If there are no further questions, we ask that you confirm the decision of this report. Thank you. Give you a few minutes. I have disputes to several of the pieces of evidence raised by the government, but that's not the point here. The point here is we have to give the plaintiff, the appellant, every inference that's reasonable in her favor. For instance, the fact that she didn't ask to be invited to the meetings. Well, there's two facts in opposition to that. One is she didn't know about all the meetings. What about the schedule being available, the calendar? Well, the schedule was made available, but it's not really available if you don't tell your employees that they can have access to it. So she didn't know about it for a time, and then she discovered it by accident. So, I mean, there's the retaliatory motive. Why are you telling some subordinates but not Ms. Allen that she can go and look? Now, they're also arguing that Ms. Hill didn't meet with the contractors for ongoing work issues. Well, that's refuted by the Exhibit A, which is attached to our briefs, and the only reason we didn't submit that initially was because it was first raised on appeal. But there's also in the appendix at 181 to 182, there's an email from Ms. Hill to Ms. Allen indicating, talking about a meeting she had with the Price Waterhouse contractors that was about ongoing work on the test of effectiveness project. So it's clear that there were times that she met with Price Waterhouse contractors in violation of federal acquisition guidelines. And in that email, Ms. Allen tells Ms. Hill that she shouldn't be meeting with the contractors without her or Ms. Crane present. There's also on Joint Appendix 202, regarding performance goal number three, that's the one with the IPIA testing where she had warned her that she didn't have enough staff to do it. But in her response to her performance review, Ms. Allen writes on page 202, your comments state that I failed to anticipate performance or documentation as potential problems. This statement is inconsistent with the facts. I identified and documented performance risks in the project charter. So she did identify those, or at least a reasonable jury could find that based on Ms. Allen's testimony. And also on page 215, she indicates that on April 8th, she had asked for more staff for the IPIA testing, that it was impossible to complete the project with just two staff and three contractors. I'm sorry, three employees and four contractors. And that Ms. Hill was also redirecting those staff and contractors to other aspects. So Ms. Allen was alerting her to the problem, and instead of resolving the problem, she blames her when what happens is exactly what Ms. Allen predicted would happen, that they weren't going to be able to complete the project. And so because there are issues of fact, I ask that you reverse the district court's grant of summary judgment and allow this case to be decided by a jury. And if there are no further questions, I'll let you go. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Kavanaugh, Pillard